UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION

| | |
|---|---|
| JOSE LUIS PENA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 2:21-cv-079-PPS |
| ) | |
| FRANK ALEMAN and EDDIE BASTARDO, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

Detective Frank Aleman and Lieutenant Eddie Bastardo of the East Chicago Police Department seek summary judgment on a Section 1983 claim related to their arrest of Plaintiff Jose Luis Pena. Because genuine issues of material fact abound as to the circumstances of Pena's arrest and the resulting justification for Defendants' use of force to effectuate that arrest, Defendants' Motion for Summary Judgment is DENIED. And because there are fact questions, the doctrine of qualified immunity does not shield the officers, at least not at this point.

**Background**

The Parties agree upon a general framework of the events at issue, but the facts surrounding the circumstances of Pena's arrest are hotly disputed. On March 3, 2019, Plaintiff Jose Pena drove to St. Catherine's Hospital in East Chicago, Indiana to see his son who had recently been shot. [DE 1 at ¶ 8.] Officer Eddie Bastardo, in his role as a lieutenant patrol officer with the East Chicago Police Department, was sent to St. Catherine's hospital to act as crowd control while the hospital admitted Pena's son.

1

[DE 67-3 at 5.] At this point, three different stories emerge.

According to Bastardo, he stood on a ramp outside the hospital near Frank Aleman, who was serving as a security guard for the hospital that evening. [*Id*. at 6.] Bastardo described two sets of doors near the ramp he stood on with Aleman. The first set of doors led to a lobby waiting room intended for family and patients. [*Id*.] The second set of doors were for medics and other first responders and led directly to the emergency room. [*Id*.]

When Pena arrived, Bastardo said that Pena first walked up the ramp towards the parked ambulance that had carried Pena's son to the hospital. [*Id*.] Bastardo testified that the ambulance was empty at this time. [*Id*.] Bastardo said that Pena then tried to walk through the second set of doors that led directly to the ER. [*Id*.] According to Bastardo, Aleman, a few feet away from Bastardo, put up his hand and told Pena to stop. [*Id*. at 7.] Bastardo said Pena began to shout profanities and told Aleman that he wanted to see his son, but Aleman told Pena that he needed to enter the hospital through the doors to the public waiting room. [*Id*.] Pena continued forward and pushed away Aleman's hand, at which point Aleman and Bastardo grabbed Pena's arms, took Pena to the ground, and handcuffed him. [*Id*.]

Aleman's account is similar, but there are several relevant differences that Pena points out in his Response.[1] First, Aleman stated that the paramedics and Pena's son

---

[1] As an aside, I have reviewed the transcript of the February 23, 2023, deposition of Aleman, [DE 67-4], in particular the exchange on pages 93 – 98 of the transcript. At that point, the deposition went off the rails and no one seems to have comported themselves in a particularly professional way. It's the kind of back and forth that gives lawyers a bad name. Attorneys have a duty when practicing before this Court under Local Rule 83-5(e), the Indiana Rules of Professional Conduct, and the *Seventh Circuit Standards of Professional Conduct* to treat opposing counsel and witnesses with respect. ("We will not, even when called upon by a client to do so, abuse or indulge in

were still in the ambulance when Pena approached it. [DE 67-4 at 6.] According to Aleman, Pena tried to enter the ambulance, which prohibited emergency personnel from escorting Pena's son into the hospital. [*Id*.] Aleman said that he asked how Pena knew the patient, but Pena did not tell him that the gunshot victim was his son. [*Id*.] Aleman also indicated that the interaction with Pena lasted several minutes, and that Pena assumed an aggressive, fighting stance that necessitated his arrest. [*Id*. at 6, 19.]

For his part, Pena said he woke up to a call that his son had been shot and then drove to the hospital. [DE 67-6 at 7–9.] As Pena arrived and parked, he approached the ambulance that had just arrived outside the hospital. [*Id*. at 10–11.] Pena agrees that Aleman ordered Pena to stop walking toward the ambulance. [DE 1 at ¶ 9.] Pena ignored Aleman's command and insisted that he be permitted to see his son. [*Id*. at ¶ 11.] Pena said he tried to sneak past the officers but denied swearing at them. [DE 67-6 at 12–13, 16.] He admits that he may have used his elbow to push the officers aside. [*Id*. at 12.] At this point, Pena said Aleman and Bastardo forcibly threw him to the ground and arrested him. [DE 1 at ¶¶ 11–12.] Pena, then 72 years-old, landed on his face and left shoulder. According to his treating doctor, Pena suffered a dislocated left shoulder, torn rotator cuff, and a displacement of his left bicep tendon. [DE 67-8 at 3; DE 63-10 at 6.]

After voluntarily dismissing his claim against the City and its former police chief, [DE 40; DE 41; DE 61; DE 62], Pena's remaining § 1983 claim is for excessive force

---

offensive conduct directed to other counsel, parties, or witnesses. We will abstain from disparaging personal remarks or acrimony toward other counsel, parties, or witnesses. We will treat adverse witnesses and parties with fair consideration."). Standards for Professional Conduct Within the Seventh Federal Judicial Circuit, Lawyers' Duties to Other Counsel ¶ 1. Neither side met this standard on this occasion.

3

against Aleman and Bastardo. The Officers have since moved for summary judgment arguing that the undisputed facts demonstrate that they did not use excessive force to arrest Pena, and, in any event, that they are entitled to qualified immunity. [*See* DE 63-11.]

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). I must take the facts in the light most favorable to the party opposing the motion. *Fulk v. United Transp. Union*, 160 F.3d 405, 407 (7th Cir. 1998).

### I.    The Defendant Officers Are Not Entitled to Summary Judgment as Matter of Law on Pena's Excessive Force Claim

Defendants first claim that the undisputed evidence demonstrates as a matter of law that their use of force to arrest Pena was reasonable under the circumstances. Section 1983 permits suit against individuals who "under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . ." 42 U.S.C. § 1983. As this language suggests, to succeed on his Section 1983 excessive force claim Pena must

4

prove two elements: "(1) the party against whom the claim is brought qualifies as a 'person acting under the color of state law'; and (2) the conduct alleged amounted to a deprivation of rights, privileges, or immunities under the Constitution or the laws of the United States." *Tom Beu Xiong v. Fischer*, 787 F.3d 389, 397 (7th Cir. 2015) (citation omitted). Defendants do not dispute that they were acting under color of law during their arrest of Pena, so the only issue is whether their actions deprived Pena of any constitutional rights.

The right at issue here is the Fourth Amendment's protection against unreasonable searches and seizures. This Fourth Amendment right applies to, and limits, the amount of force that law enforcement may use on an individual. *See Stainback v. Dixon*, 569 F.3d 767, 771–72 (7th Cir. 2009). "When an officer is accused of using excessive force, the decisive question is whether the officer's conduct meets the Fourth Amendment's objective standard of reasonableness." *United States v. Brown*, 871 F.3d 532, 536 (7th Cir. 2017). This reasonableness inquiry requires me to examine the "specific circumstances of the arrest", including: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight. *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012) (quoting *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

This reasonableness inquiry balances two important considerations: "the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing governmental interests at stake." *Graham*, 490 U.S. at 396. The

totality of the circumstances test recognizes that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving —about the amount of force that is necessary in a particular situation." *Id*. at 397. The inquiry is objective and "does not take into account the motives or intent of the individual officers." *Phillips*, 678 F.3d at 520.

Defendants focus their argument on Pena's admitted non-compliance with their commands and the contested issue of whether, and to what extent, Pena resisted his arrest. According to Defendants, Pena "was actively resisting arrest, threatening the officers' safety and the safety of others." [DE 63-11 at 6.] While Pena admits he did not comply with the Officers' verbal commands, he denies that he physically resisted arrest. [*See* DE 67-2 at 5.] As the nonmovant party, I view all facts in the light most favorable to Pena, *Fulk*, 160 F.3d at 407, so I will proceed on the assumption that Pena did not comply with the Officers' verbal commands and may have brushed by one of the Officers, but that he did not further resist his arrest.

The first factor of the reasonableness inquiry, severity of crime at issue, weighs in favor of Pena. According to Exhibit H in Defendants' Motion for Summary Judgment, state prosecutors charged Pena with three misdemeanors for this incident: (1) disorderly conduct; (2) resisting law enforcement; and (3) obstructing an emergency medical person. [DE 63-9 at 1–3.] Moreover, according to Pena and this Court's review of the docket sheet for these cases, state prosecutors appear to have dismissed all three misdemeanors on September 9, 2021. [DE 63-8 at 7.] None of these charges were for felonies, and, while I will decline to speculate as to the reasons why state prosecutors

dropped these charges, Pena has not been convicted of any of these charges. I do not intend to be dismissive of the nature of these charges, but, as I discuss below, the severity of the alleged crimes at issue here are on the less serious end of the spectrum.

The threat posed factor also weighs in favor of Pena. Whether any medical personnel or patients were in the vicinity of Pena's arrest, and therefore in possible danger, is a disputed fact. According to Pena and Aleman, they were not. I also give weight to Pena's age, 72 at the time, and that at this juncture I must take Pena at his word that he had not assumed a physically threatening posture. These considerations paint a picture of a distraught elderly man who was in shock but did not pose a serious threat to the officers or others around him. When viewing this incident in the light most favorable to Pena, as I must in summary judgment, the incident is best viewed as passive resistance to crowd control – not as a serious threat to the lives of others. I now turn to consideration of the degree to which Pena resisted arrest.

"[T]he law is clearly established that police officers cannot use 'significant' force on subjects who are only passively resisting arrest." *Miller v. Gonzales*, 761 F.3d 822, 829 (7th Cir. 2014). Even still, officers are entitled to use *some* degree of force to arrest subjects who passively resist arrest. *See Smith v. Ball State Univ.*, 295 F.3d 763, 770–71 (7th Cir. 2002) (finding that officers' use of a "straight arm bar" technique was a reasonable amount of force to remove a nonresponsive subject from a vehicle). The question here is whether the Officers used a *degree* of force that was reasonable when considering the circumstances of Pena's mostly passive resistance, the lack of serious threat that he posed, and the comparatively mild severity of the misdemeanor crimes

7

he was charged with.

An evaluation of the circumstances for arrest of passively resisting subjects in other cases reveals that Pena's conduct, based on the facts before me, did not rise to a level that warranted the application of force to flip him airborne and slam his face and shoulder onto the ground. In *Smith*, for example, officers reported to the scene of an accident by a purported drunk driver who had struck several pedestrians. *Smith*, 295 F.3d at 766. When officers arrived, the driver was unresponsive, and the car was still running. *Id*. Unbeknownst to the officers, the driver had suffered a diabetic shock. *Id*. The officers forcibly removed the non-responsive driver from the car, but a later arriving officer, believing that the officers and driver were engaged in a struggle, applied a knee strike to the driver and tackled everyone to the ground. *Id*. The officers then held the driver's face to the ground and handcuffed him. *Id*. at 766–67. The Seventh Circuit held that the officers' forcible removal, knee strike, and use of handcuffs were all justified given "the potential threat to public safety of an intoxicated driver in command of a running vehicle." *Id*. at 770. Importantly, the Seventh Circuit noted that the driver's unresponsiveness constituted resistance that required "the minimal use of force" to effectuate the arrest. *Id*. at 771.

*Phillips v. Community Ins. Corp.*, when read together with *Smith*, provides additional insight on the requirement that officers use a "minimal" amount of force when confronted with noncompliance or "passive resistance." 678 F.3d 513 (7th Cir. 2012). In *Phillips*, the arresting officers fired multiple rounds of plastic bullets at a drunk driver who had crashed and refused to exit the vehicle. *Id*. at 517–18. The

Seventh Circuit noted the difference between noncompliance, requiring the minimal use of force, and active resistance, which allows for escalation of force. *Id*. at 525. Finding that Phillips' noncompliance fell into the former category, the Seventh Circuit noted the "commonsense need to mitigate force when apprehending a non-resisting subject" and determined the officers' use of force to be unreasonable. *Id*. at 526. Phillips' immobilization and lack of indication that she intended to harm the officers or anyone else, as well as the nature of the crime at issue, all weighed in her favor in the Court's totality of the circumstances analysis. *Id*. at 525.

    I take care to judge the situation "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. But it is clear from *Smith* and *Phillips* that the Officers cannot at this point prove *as a matter of law* that their use of force was reasonable under the circumstances. The nature of the crimes at issue here are less severe than *Smith* and *Phillips*. Likewise, the potential danger Pena posed is lesser in degree than both *Smith* and *Phillips*. There were no injured pedestrians or indications that a drunk driver was on the loose and still behind the wheel of a running vehicle. And while the degree of force used here is less than *Smith*, it is arguably more severe than in *Phillips*. When viewing the facts in the light most favorable to Pena, he was not actively resisting arrest with physical force and did not pose a significant threat to the officers or others around him. Instead of the "minimal use of force", such as handcuffing or restraining Pena's arms, Pena tells me that the Officers executed a body slam on him (remember, he was a 72-year-old man at the time) leaving him severely injured. Under the totality of the circumstances, I find

that the Officers have not proved that their use of force was reasonable under the Fourth Amendment. *See Phillips*, 678 F.3d at 527 ("Permitting substantial escalation of force in response to passive non-compliance would be incompatible with our excessive force doctrine and would likely bring more injured citizens before our courts.")

Summary judgment is not warranted based on the contested factual record before me. The Parties disagree on the facts relevant to just about every factor I must consider in evaluating the degree of Aleman and Bastardo's use of force. It will be up to a jury to sort out these factual issues concerning the circumstances of the arrest and to determine whether Aleman and Bastardo's use of force was reasonable under those circumstances. *See Catlin v. City of Wheaton*, 574 F.3d 361, 367 (7th Cir. 2009) (Noting that "[s]ummary judgment is often inappropriate in excessive forces cases" because "the parties typically tell different stories about what happened.").

## II. The Defendant Officers Are Not Entitled to Qualified Immunity

Having found that it will be for the jury to decide the facts necessary to determine whether the Officers' use of force was objectively reasonable under the circumstances, I must now determine whether the Officers are entitled to qualified immunity given their status as a law enforcement officers accused of violating constitutional rights.

Qualified immunity provides that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982). "Qualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law.'" *Messerschmidt v. Millender*, 565 U.S. 535, 546 (2012) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)). "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness' of the action, assessed in light of the legal rules that were 'clearly established' at the time it was taken." *Anderson v. Creighton*, 483 U.S. 635, 639 (1987) (internal citation omitted).

Evaluation of a qualified immunity defense is a two-step inquiry: "(1) whether the facts alleged or shown by the plaintiff establish a violation of a constitutional right, and (2) if so, whether that right was clearly established at the time of the defendant's alleged misconduct." *Dockery v. Blackburn*, 911 F.3d 458, 466 (7th Cir. 2018). I may analyze these factors in any order. *Id*. Beginning with the second factor, the events in question took place in March 2019. At that time, that an officer may not use excessive force against an individual during an arrest was a clearly established constitutional right. *Holmes v. Vill. of Hoffman Estates*, 511 F.3d 673, 687 (7th Cir. 2007). It was likewise clearly established that "using a significant level of force on a non-resisting or a passively resisting individual constitutes excessive force." *Avina v. Bohlen*, Case No. 13-CV-1433, 2018 WL 2324105, at *12 (E.D. Wis. May 22, 2018) (quoting *Alicea v. Thomas*, 815 F.3d 283, 292 (7th Cir. 2016). *Smith* and *Phillips* illustrate this right.

But as with the above analysis of the reasonableness of the Officers' use of force, which I could not answer as a matter of law based upon the record before me, I also

11

cannot at this juncture decide as a matter of law that Pena will not be able to establish a violation of this constitutional right. The same analysis above for excessive force applies to consideration of the Officers' request for qualified immunity. *See Sheehan v. Noble Ct. Sheriff's Dept.*, 2016 WL 7100555, at *13 (N.D. Ind. Dec. 6, 2016) ("The Defendants' argument for qualified immunity is based on the assumption that the force used against [the plaintiff] was reasonable under the circumstances. But since the Court cannot make that assumption, it likewise cannot conclude that Defendants are entitled to qualified immunity. If a jury finds that any of the Defendant officers are liable for excessive force, then by definition they would not be entitled to qualified immunity."). Based on the current record, Aleman and Bastardo are not entitled to summary judgment on the basis of qualified immunity.

## Conclusion

For the aforementioned reasons, Aleman and Bastardo's Motion for Summary Judgment [DE 63] is **DENIED**. SO ORDERED.

ENTERED: July 30, 2024

s/ Philip P. Simon
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT